**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | 1:08-cr-0027 OWW |
| ) | |
| Plaintiff, ) | SUPPLEMENT TO ORAL |
| ) | STATEMENT OF DECISION |
| v. ) | RE MOTION TO SUPPRESS |
| ) | |
| RONALD JOHNSON, ) | |
| ) | |
| Defendant. ) | |
| ) | |

On August 11, 2008, an evidentiary hearing was held on Defendant's Motion to Suppress Evidence. The Court made oral findings subject to completing legal research. Those oral findings are not repeated but are, by this reference, incorporated in this Statement of Decision.

On January 3, 2008, Fresno Police Officer Donald Dinnell responded to the residence at 3878 E. Turner Avenue, Fresno, California, to execute outstanding valid arrest warrants on Defendant Ronald Johnson and his wife Diane Johnson. Officer Dinnell had also been provided information by Detective Ridenhauer of the Fresno Problem-Oriented Policing Central SIR, that citizen calls had been received complaining about narcotics activities and sales at the 3878 E. Turner Avenue residence,

1

prior to January 3, 2008.

When the Officers arrived at the property, they observed a residence structure, a separate three-sided detached garage and a third structure to the south of the detached garage and residence. The Officers observed garbage, a freezer, and other debris strewn about the residence grounds. The Officers announced their presence and purpose, to serve arrest warrants, and encountered Diane Johnson in the main residence, where she was arrested.

Officer Dinnell asked about the whereabouts of Ronald Johnson, and was told by Diane Johnson that he was in the detached garage adjacent to the residence. Ms. Johnson gave consent for the Officers to find Mr. Johnson. The Officers went to the detached garage which had three sides, covered with a tarp, a roof made out of cloth and cardboard and saw Defendant Ronald Johnson standing in an area with his back to the Officers trying to hide something. Officer Dinnell also observed a stereo cabinet at which Mr. Johnson was moving his hands to put something away. Less than three feet from Mr. Johnson was a box for a firearm, that was clearly marked as such by printing on the box.

Officer Dinnell stated that he knew Defendant was serving a felony arrest warrant for failure to appear, that the Defendant was a felon, that narcotics activity had been reported at the residence and that a firearm could be in the labeled box which was in plain view and was within the Defendant's reach. The Officer then feared for his personal safety.

Based on this perceived risk, Officer Dinnell drew his

firearm, ordered Mr. Johnson to put his hands up, and with the assistance of another Officer, took Mr. Johnson into custody and handcuffed him.  At Mr. Johnson's feet, Officer Dinnell observed what appeared to be a glass methamphetamine pipe.  The Officers then opened the labeled box and found a .22 caliber nine-shot revolver.  The box also contained .22 caliber ammunition and rifle cartridges.

Officer Dinnell then *Mirandized* Mr. Johnson using his FPD-issued rights card.  The Defendant stated he understood his rights and agreed to speak.  Also in plain sight was white powder that appeared to be crystal methamphetamine.  Mr. Johnson stated that he had recently acquired the pistol, having traded a stereo for the firearm.

Officer Dinnell was aware that Mr. Johnson's 14-year-old daughter was in the residence and Mr. and Mrs. Johnson stated that their 14-year-old daughter was in an adjacent structure with an adult male named Junior.  The Johnsons stated they did not want their daughter inside with Junior.  Officer Dinnell was asked by the Johnsons to go inside the residence to look for their daughter.  The Officer conducted a protective sweep.

The Officer testified that his observation of the residence where Defendant was encountered, was filthy, cockroaches were visible, the water did not work as it had apparently been shut off, and there was no stove.  The interior of the residence was so cluttered with discarded items, clothing, and other articles, that the door could barely be opened.  Officer Dinnell described the interior condition of the residence as deplorable and as a health risk to the safety of its inhabitants, particularly the 14

year old girl.

Officer Dinnell also opined that the Defendant was under the influence of methamphetamine based on rapid jerking motions, dilated pupils of his eyes, eyelid tremors, and other objective symptoms.  Officer Dinnell also testified that he considered the situation to be an emergency and that he intended to conduct a sweep of all structures to determine if anyone else was present and to determine the level of risk to the safety of the 14 year old, particularly because there was no running water, the utilities did not appear to work and the residence was filthy and hazardous.  Officer Dinnell testified that following the arrest of Diane Johnson, it was the Officers' purpose to locate the 14 year old to secure her safety.

Officer Steve Gonzales of the Fresno Police Department testified that he was Officer Dinnell's partner and that his observation of the house was that it was in extreme disarray, very dirty, very cluttered, and he had great concern that the residence was not safe for a 14 year old to be inside.  Officer Gonzales found the 14 year old in the living room of the main residence and took the 14 year old out of that structure. Officer Gonzales noticed that a bedroom in the residence was also in the same level of clutter, disarray, and unsanitariness.  He observed a toilet that was clogged with feces and did not have running water.  There was no other bathroom.  Officer Gonzales then went to the third structure to see whether there were any sanitary facilities or an operative stove or other utilities. The door was ajar to the third structure, which was south of the makeshift garage.  As Officer Gonzales entered the room, he saw,

in front of him, a rifle butt and to his right on a shelf he saw another rifle.  As Officer Gonzales knew that Defendant Johnson was a convicted felon, Officer Gonzales took possession of both rifles, which were in plain view.

Officer Gonzales was then conducting a protective sweep for the health and safety of the 14 year old.  He does this as a matter of course in cases involving juveniles, as he knew that he had to call CPS.  Officer Gonzales described the regularly-established procedures whereby emergency referrals must be made to Child Protective Services and that he always conducts a protective sweep of any residence area where a juvenile is in residence, who may have to be committed to CPS custody.  Officer Gonzales stated that he believed that an emergency existed as the living conditions were uninhabitable at all three structures.

**LAW AND ANALYSIS**

    A.    <u>Seizure of the Two Rifles</u>

The rifles were seized pursuant to the emergency doctrine which justify an officer's warrantless entry into a home and seizure of evidence of a crime that is in plain view.  The emergency entrance doctrine is established by *Mincey v. Arizona*, 437 U.S. 385, 392 (1978), which acknowledges the right of police to respond to emergencies.  An entry or search that would otherwise be barred by the Fourth Amendment, may be justified by the need to protect life or avoid serious injury.  *Id.* at 392. The appropriateness of the application of the emergency doctrine is decided on a case-by-case basis.  *United States v. Bradley*, 321 F.3d 1212, 1215 (9th Cir. 2003).

The emergency doctrine has been further explained in *United States v. Russell*, 436 F.3d 1086 at 1090 (9th Cir. 2006), wherein the following elements are identified: (1) the police must have reasonable grounds to believe there is an emergency at hand and immediate need for the assistance for the protection of life or property; (2) the search must not be primarily motivated by intent to arrest and seize evidence; and (3) there must be some reasonable basis approximating probable cause, to associate the emergency in the area or place to be searched.  *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005); *Martin v. City of Oceanside*, 360 F.3d 1078, 1082 (9th Cir. 2004).  The emergency doctrine also recognizes that police function as community caretakers, in addition to their roles as criminal investigators and law enforcers.  *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005).  That as "protection of the public might in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable."  *Cady v. Dumbrowski*, 413 U.S. 433, 447 (1973).

In the *Bradley* case, 321 F.3d at 1215, the mother of a 9 year old child who was arrested was not caring for him; the Officers could not locate the child in the places she said he would be.  The Officers were unaware of the safety conditions inside the house where the child resided.  The Court of Appeals held that the possibility a 9 year old child was in a house in the middle of the night without supervision of any responsible adult, was a situation requiring immediate police assistance. *Id.* at 1215.  The *Bradley* case specifically holds that a protective sweep by an officer conducted inside the residence is

6

not unlawful if evidence is in plain view. *United States v. Hudson*, 100 F.3d 1409, 1420 (9th Cir. 1996); *Bradley* at p. 1215.

Here, Officer Gonzales was confronted with a hazardous and uninhabitable dwelling occupied by a 14 year old, both of whose parents had been placed under arrest and were being transported to jail. Due to deplorable living conditions and the risk to the health of the child, the Officer had to call Child Protective Services. The Officers' normal practice is to review the residence to determine whether it is habitable, and whether or not, if an appropriate guardian is available, the child can be maintained in the residence or has to be placed in foster care.

Further, Mrs. Johnson had consented to the protective sweep by authorizing the Officers to look for her daughter to assure that her daughter was not left with Junior.

Upon entry into the third structure, where the door was partially open, Officer Gonzales immediately observed, in plain view, two rifles. He knew Mr. Johnson, as a convicted felon, could not lawfully possess these rifles. The seizure of evidence of a crime that was in plain view while conducting a lawful protective sweep, does not violate any provision of the Fourth Amendment.

SEIZURE OF THE .22 CALIBER PISTOL

A search incident to arrest is an exception to the general rule against one or more searches. *United States v. Hudson*, 100 F.3d 1409, 1419 (9th Cir. 1996). The justification to permit a warrantless search is the "need [of law enforcement officers] to seize weapons or other things which might be used to assault an

officer, effect an escape, as well as the need to prevent the loss or destruction of evidence." *United States v. McConney*, 728 F.2d 1195, 1206 (9th Cir. 1991). A legitimate "search incident to arrest" is limited to the arrestee's person and to the area "within his immediate control," meaning "the area was one in which he might gain possession of a weapon or destructible evidence." *Chimmel v. California*, 395 U.S. 752, 763 (1969). A critical inquiry is "whether the search . . . was properly limited to the area within [the arrestee's] immediate control at the time of his arrest." *McConney*, 728 F.2d at 1207.

A court weighs factors including the number of persons being arrested; the number of officers present; the physical position with regard to the arrestee and the premises being searched; the display of guns by the officers, and the distance between the arrestee and the place searched. *Hudson*, 100 F.3d at 1419. The search must be conducted "at 'about the same time as the arrest.'" *United States v. Turner*, 926 F.2d 887 (9th Cir. 1991). The search may be conducted shortly after the arrestee has been removed from the area, provided that (1) the search is restricted to the area that was "within the arrestee's immediate control when he was arrested," *Turner*, 926 F.2d at 888, and (2) events occurring after the arrest, but before the search, incident to arrest, did not render the search unreasonable. *Turner*, at 888. In *Turner*, the search was not unreasonable where only a few minutes had passed between the arrest and the search, the Defendant was taken to the next room out of concern for the officers' safety, a gun was found in the room where the Defendant had been arrested, and the Defendant was held near the site of

the arrest. 926 F.2d at 888.

As to the physical scope of the search, a search incident to arrest, may "encompass a room from which the arrestee has been removed." *Turner*, at 887-888. A search incident to arrest may justify the opening of containers found within the physical area covered by the search. *Hudson*, at p. 1419; *United States v. Andersson*, 813 F.2d 1450, 1455 (9th Cir. 1987). The rationale for searches of open or closed containers is "not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interests the arrestee may have." *New York v. Belton*, 453 U.S. 454, 460-61 (1981).

Here, Officer Dinnell encountered Defendant trying to hide something and the Officer also observed narcotics paraphernalia. Within three feet and the reach of Defendant, the Officer saw a box labeled as a firearm container. As in *Hudson*, where the arresting officer noticed a rifle case near the feet of the Defendant, although the rifle was contained in a case, it was within the Defendant's reach and constituted a potential danger to the arresting officer. The physical proximity of the firearm supports a conclusion that the search fell within the spatial limitations of a search incident to arrest.

The box was also seizable under the "plain view" exception to the warrant requirement, when two criteria are met: (1) "the initial intrusion must be lawful" and (2) "the incriminatory nature of the evidence must be immediately apparent to the officers." *United States v. Simpson*, 10 F.3d 645, 647 (9th Cir. 1993), overruled on other grounds, 513 U.S. 983 (1994). Here,

1  the arrest of Johnson pursuant to an active arrest warrant was
2  valid.  This satisfies the first criteria of the plain view
3  doctrine.
4      The second criteria is met where the officer had "probable
5  cause to associate the property with criminal activity."  By
6  requiring the incriminatory nature of the evidence to be
7  "immediately apparent," the doctrine does not require that the
8  officer "be possessed of near certainty as to the seizable nature
9  of the items."  *Texas v. Brown*, 460 U.S. 730, 741 (1980).
10 Instead, probable cause "is a flexible, common-sense standard"
11 requiring only that "the facts available to the officer would
12 'warrant a man of reasonable caution in the belief that certain
13 items may be contraband . . . or useful evidence of a crime."
14 *Brown*, at pp. 741-742.
15     The second criteria of the plain view requirement is also
16 satisfied here.  The Officer observed a box labeled as a firearm
17 container.  The Officer knew Defendant was a convicted felon and
18 the firearm was within his reach.  The seizure of the firearm
19 container and the firearm contained within it as evidence of
20 crimes, are fully justified and lawful.

## CONCLUSION

23     For all the reasons stated above, Defendant's Motion to
24 Suppress the .22 caliber pistol seized from the box in close
25 ///
26 ///
27 ///
28 ///

**proximity to the defendant and the two rifles seized in the third structure, are DENIED.**

IT IS SO ORDERED.

**Dated:    August 20, 2008**              /s/ Oliver W. Wanger
                                          UNITED STATES DISTRICT JUDGE